1

2

3

4                   UNITED STATES DISTRICT COURT

5                 NORTHERN DISTRICT OF CALIFORNIA

6

7    CODEXIS, INC.,                          Case No.  16-cv-00826-WHO

            Plaintiff,
8                                            **ORDER GRANTING IN PART AND**
                                             **DENYING IN PART MOTION TO**
9        v.                                  **DISMISS**

10   ENZYMEWORKS, INC., et al.,              Re: Dkt. No. 34

            Defendants.
11

12                              **INTRODUCTION**

13          Plaintiff Codexis, Inc. alleges that defendant Junhua Tao stole its confidential and

14   proprietary information and used it to start his own business, EnzymeWorks, Inc.[1]  The operative

15   complaint asserts ten claims for patent infringement, a claim for trade secret misappropriation, and

16   five state law claims for breach of contract, intentional interference with customer relations,

17   intentional interference with prospective economic advantage, statutory unfair competition, and

18   common law unfair competition.

19          Defendants move to dismiss the state law claims and Codexis's alter ego and agency

20   theories of liability.  The facts alleged, and the reasonable inferences that can be drawn from them,

21   are sufficient at the pleading stage for every claim except under the unfairness prong of Cal. Bus.

22   & Prof. Code § 17200, *et seq.* (the "UCL").  Codexis has plausibly pleaded its state claims based

23   on a host of allegations involving defendants' copying Codexis's products, mimicking its business

24   model, interfering with its customer relationships, and breaching the terms and conditions

25   accompanying its products.  It has also plausibly established a basis for alter ego liability between

26   Tao and EnzymeWorks, but not as between the two EnzymeWorks entities.  It has not

27   _____

28   [1]This Order refers to defendants EnzymeWorks, Inc. and EnzymeWorks, Inc. (China) collectively
     as "EnzymeWorks" or the "EnzymeWorks entities."

United States District Court
Northern District of California

demonstrated an agency relationship between the parties.  Accordingly, the motion to dismiss the agency theory of liability is GRANTED with leave to amend.  The remainder of the motion is DENIED.

## BACKGROUND

Codexis is a biotechnology company that designs and engineers custom-made enzymes, known as "biocatalysts," that accelerate or catalyze chemical reactions.  First Amended Complaint ("FAC") ¶¶ 4, 5 [Dkt. No. 32].  These enzymes can be used to manufacture a variety of chemical compounds, including therapeutic proteins, food ingredients, and fine chemicals.  *Id.* ¶ 6.  Biocatalysis is more sustainable, efficient, and cost-effective than traditional techniques.  *Id.* ¶ 7.

In 2004, Codexis entered into a partnership with an unidentified global pharmaceutical company regarding Codexis's technology and intellectual property rights in the field of biocatalysis (the "Pharmaceutical Collaboration").  *Id.* ¶ 11.  Tao worked at this pharmaceutical company, serving as a Group Leader from 1998 to 2006.  *Id.* ¶ 10.  As part of the Pharmaceutical Collaboration, Codexis scientists interacted directly with its collaborator's scientists, including Tao, and shared "extensive" confidential information about Codexis's biocatalysis technology.  *Id.* ¶ 13.  "Over the course of the Pharmaceutical Collaboration, Codexis shared know-how, novel engineered enzymes, proprietary plasmids, and other information and materials with its collaborator, including Tao, that would have been unavailable to anyone at that global pharmaceutical company but for its collaboration with Codexis."  *Id.* ¶ 14.

At some point during the Pharmaceutical Collaboration, Tao left the pharmaceutical company, presumably because of a layoff.  *Id.* ¶ 16.  Codexis alleges that when Tao was terminated he left the company with "Codexis's proprietary information, including information about Codexis's enzymes and/or their corresponding DNA and amino acid sequences, and detailed information about Codexis's protein engineering and manufacturing processes."  *Id.*

After an initial start-up failed, Tao founded EnzymeWorks in 2010.  *Id.* ¶ 18.  EnzymeWorks manufactures and sells enzymes, including ones that Codexis also sells.  *Id.* ¶ 20.  Codexis alleges Tao and EnzymeWorks embarked on a "deliberate plan to copy Codexis's enzymes, to misappropriate Codexis's trade secrets, and to misleadingly hold out to customers

1    their copied products and technical guidance  as their own, all as a short-cut to entering the

2    promising new market that Codexis had created." *Id*. ¶ 21.  In pursuit of that goal, Tao hired at

3    least two former Codexis scientists, Xinkai Xie and Kui Chan. *Id*. ¶¶ 25, 26.  The scientists were

4    hired allegedly because of their access and familiarity with Codexis's confidential and proprietary

5    information. *Id*.

6            Codexis asserts that EnzymeWorks is selling "knock-off" enzyme products to Codexis's

7    customers in direct and unfair competition with Codexis. *Id*. ¶ 30.  The FAC offers two examples

8    as representative of EnzymeWorks's "blatant copying, infringement, and other unlawful business

9    practices:" its kits for ketoreductases and transaminase. *Id*. ¶ 32.  These kits include enzymes that

10   are "exact, 100% molecular copies" of Codexis's proprietary enzymes as well as "almost

11   verbatim" copies of Codexis's written guidance on the purposes and uses of the kits. *Id*. ¶¶ 37-38.

12   In addition to the patented material, Codexis also alleges Tao and EnzymeWorks stole its trade

13   secret plasmid information or biomaterials. *Id*. ¶ 47.

14           Codexis's FAC encompasses multiple different theories of liability.  The first ten claims,

15   Counts I to X, are focused on alleged patent infringement. *Id*. ¶¶ 72-234.  Count XI alleges

16   misappropriation of trade secrets under the California Uniform Trade Secrets Act. *Id*. ¶¶ 235-52.

17   The remaining five claims involve state law causes of action including: (1) breach of contract; (2)

18   intentional interference with contractual relations; (3) intentional interference with prospective

19   economic relations; (4) a violation of Cal. Bus. & Prof. Code § 17200, *et seq*. (the "UCL"); and

20   (5) common law unfair competition. *Id*. ¶¶ 253-293.  Codexis alleges defendants are responsible

21   not only for their own conduct, but also for that of the other two parties under alter ego and agency

22   theories of liability. *Id*. ¶¶ 65-66.

23           Defendants move to dismiss all of the state law causes of action and to strike the alter ego

24   and agency allegations. Mot. [Dkt. No. 34].  I heard argument on June 29, 2016.

25                                      **LEGAL STANDARD**

26           To survive a motion under Federal Rule of Civil Procedure 12(b)(6), the plaintiff must

27   allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v.*

28   *Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible when the plaintiff pleads facts

United States District Court
Northern District of California

1    that "allow the court to draw the reasonable inference that the defendant is liable for the

2    misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  There must

3    be "more than a sheer possibility that a defendant has acted unlawfully."  *Id*.  While courts do not

4    require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a

5    right to relief above the speculative level."  *Twombly*, 550 U.S. at 555, 570.

6         In deciding whether the plaintiff has stated a claim upon which relief can be granted, the

7    court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the

8    plaintiff.  *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).  However, the court

9    is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of

10   fact, or unreasonable inferences."  *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir.

11   2008).  If the court dismisses the complaint, it "should grant leave to amend even if no request to

12   amend the pleading was made, unless it determines that the pleading could not possibly be cured

13   by the allegation of other facts."  *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000).

                                    **DISCUSSION**

15        Defendants move to dismiss all of Codexis's state law claims as well as its alter ego and

16   agency theories of liability.  I address each in turn.

17   **I.    BREACH OF CONTRACT**

18        In order to establish a breach of contract, a plaintiff must prove: (1) the existence of a

19   contract; (2) plaintiff's performance; (3) defendants' breach; and (4) resulting damages to plaintiff.

20   *CDF Firefighters v. Maldonado*, 158 Cal. App. 4th 1226, 1239 (2008).  Defendants argue that

21   Codexis's allegations insufficiently establish the formation of a contract or their assent to the

22   terms and conditions.

23        The complaint alleges that certain products are subject to written terms and conditions and

24   that those who "order, buy, accept, open and/or use the Codexis product, agree that they shall not,

25   and shall not permit any third party to, for example extract information, reverse engineer,

26   deconstruct, disassemble sequence, copy, alter, modify, create derivatives, or in any way

27   determine the biological, chemical, or physical structure or composition of the Codexis product."

28   FAC ¶ 51.  The FAC attaches examples of four versions of its standard terms and conditions that

4

1   were provided with and governed the use of products sold from 2009 to 2015.  *Id*., Exhs. 11-14.

2   "At all relevant times, a user of a Codexis product could accept the Codexis Terms & Condition

3   upon opening or using the product."  *Id*. ¶ 260.  Additionally, at least since 2015, any party buying

4   or ordering a Codexis product online could affirm its acceptance to the terms and conditions by

5   "first ordering the product, and again, a second time, upon opening or using the product."  *Id*. ¶

6   261.  "On information and belief, Tao and EnzymeWorks ordered, bought, accepted, opened

7   and/or used one or more of Codexis's products."  *Id*. ¶ 263.

8       Defendants contend this claim should be dismissed because Codexis has not alleged that

9   defendants purchased any products from its website, the terms governing 2013 and 2014 are

10  "conspicuously" missing, and defendants did not affirmatively assent to any potential terms.  None

11  of these arguments is convincing at the pleading stage.

12      First, the breach of contract allegations do not depend on defendants purchasing their

13  products on the website.  The FAC does not specify either way.  While, at least since 2015, a party

14  ordering online would assent to the terms and conditions first by ordering the product and a

15  second time by opening it, the FAC also asserts that at all relevant times, simply opening the

16  product also constituted acceptance.  The FAC further alleges that defendants in fact opened or

17  used one or more of Codexis products.  *Id*. ¶ 263.

18      Second, Codexis alleges that the four examples of its terms and conditions that accompany

19  its complaint are effective "as of" October 2009, January 2010, August 2012, and April 2015.  *Id*.

20  ¶¶ 256-59.  On the basis of the currently pleaded allegations, a reasonable inference exists that

21  purchases between 2013 and 2014 were governed by the terms that were effective as of August

22  2012.[2]  Further, because the complaint does not specify that defendants' purchases occurred

23  between 2013 and 2014, defendants fail to explain why the absence of terms during this period is

24  relevant to the question of whether the claim should be dismissed at this point.  *See James River*

25  *Ins. Co. v. DCMI, Inc.*, No. 11-cv-06345-WHA, 2012 WL 2873763, at *3 (N.D. Cal. July 12,

26  2012) (concluding that although the breach of contract claim contained "relatively few details and

27

28  _____
    [2] Even if they are not, it is reasonable to infer that such purchases would be governed by language
    that is substantially similar to the contracts that have been provided.

United States District Court
Northern District of California

1     [did] not append a copy of a written contract, it nevertheless sufficiently allege[d] all of the

2     required elements of a breach of contract claim"); *RSI Corp. v. Int'l Bus. Machines Corp.*, No. 08-

3     cv-3414-RMW, 2010 WL 726032, at *2 (N.D. Cal. Feb. 26, 2010) (finding that the complaint had

4     sufficiently alleged a breach of contract within two years prior to the filing of the action when the

5     plaintiff had alleged "multiple, repeated, separate and ongoing breaches" without providing the

6     specific date of the breach).

7        Lastly, Codexis has sufficiently pleaded that defendants' have assented to its terms and

8     conditions.  Codexis alleges that the contracts expressly conditioned the acceptance of their terms

9     on "opening or using" the products.  *Id*. ¶¶ 260, 261 (the terms effective as of August 2012

10    provide: "BY OPENING THE MATERIALS, YOU ARE AGREEING TO BE BOUND BY

11    THESE T&C's.  IF YOU DO NOT AGREE WITH THESE T&C's, DO NOT OPEN OR USE

12    THE MATERIALS.").  These types of agreements are generally known as "shrinkwrap"

13    agreements.  *See Tompkins v. 23andMe, Inc*., No. 5:13-cv-05682-LHK, 2014 WL 2903752, at *5

14    (N.D. Cal. June 25, 2014) ("A shrinkwrap agreement generally refers to a situation where a

15    customer buys and receives a product, the written agreement is presented with the product after

16    purchase, and the customer implicitly accepts by opening and keeping the product.").  Codexis

17    asserts that defendants in fact "opened and/or used one or more of Codexis products."  FAC ¶ 263.

18    Therefore, by doing so, defendants assented to the terms.  *See Stomp, Inc. v. NeatO, LLC*, 61 F.

19    Supp. 2d 1074, 1081 (C.D. Cal. 1999) (holding that "by their terms" shrinkwrap contracts are

20    effective once the shrinkwrap is opened); *Novell, Inc. v. Unicom Sales, Inc*., No. 03-cv-2785-

21    MMC, 2004 WL 1839117, at *11 (N.D. Cal. Aug. 17, 2004) ("Contracts contained in software

22    boxes, which are sometimes referred to as 'shrink wrap licenses,' are no less enforceable than any

23    other type of contract.").

24 **II.**      **INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS**

25        To state a claim for intentional interference with contractual relations, a plaintiff must

26    show: (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this

27    contract; (3) defendant's intentional acts designed to induce breach or disruption of the contractual

28    relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting

United States District Court
Northern District of California

1    damage.  *Pac. Gas & Elec. Co. v. Bear Stearns & Co*., 50 Cal. 3d 1118, 1126 (1990).

2         Codexis's claim relies on allegations of "breaches of contract" and "other deceptive and

3 unfair business practices" that have "prevented the performance of Codexis's contracts with its

4 customers, business partners, employees, and collaborators, or made performance of such

5 contracts more expensive and difficult including at least the Pharmaceutical Collaboration and/or

6 supply agreement between Codexis and Tao's former employer."  FAC ¶ 272.  Defendants make

7 two primary arguments in favor of dismissal: (1) any interference with the Pharmaceutical

8 Collaboration is preempted by the California Uniform Trade Secrets Act ("CUTSA"); and (2)

9 interferences with other contracts are not sufficiently pleaded.  While I agree with defendants that

10 the interference with the Pharmaceutical Collaboration, as pleaded, is preempted by CUTSA,

11 Codexis has plausibly pleaded violations with other contracts.

12         CUTSA provides for the civil recovery of actual loss or other injury caused by the

13 misappropriation of trade secrets.  Cal. Civ. Code § 3426.3.  The Act includes a savings clause

14 that preempts claims based on the same nucleus of facts as trade secret misappropriation.  *See*

15 *SunPower Corp. v. SolarCity Corp.*, No. 12-cv-00694-LHK, 2012 WL 6160472, at *3 (N.D. Cal.

16 Dec. 11, 2012) ("CUTSA includes a savings clause (Section 3426.7) that preempts claims based

17 on the same nucleus of facts as trade secret misappropriation.") (internal quotation marks and

18 modifications omitted); *K.C. Multimedia, Inc. v. Bank of America Tech. & Operations, Inc.*, 171

19 Cal. App. 4th 939, 962 (2009) (CUTSA "preempt[s] claims based on the same nucleus of facts as

20 trade secret misappropriation.").

21         Codexis alleges that when Tao left his former employer with Codexis's "proprietary and

22 confidential information," it became more difficult to enforce the ongoing confidentiality

23 obligations between Codexis and Tao's former employer.  Oppo. at 8.  This underlying act shares

24 the same nucleus of facts as Codexis's trade secret claim.  *See* FAC ¶¶ 235 -252 (asserting a

25 CUTSA claim based on allegations that defendants misappropriated Codexis's trade secret

26 information and biomaterials in violation of strict confidentially and non-disclosure obligations).

27 In cases like this where the "gravamen of the wrongful conduct" is the misappropriation of a trade

28 secret, CUTSA preemption applies.  *See K.C. Multimedia, Inc*., 171 Cal. App. 4th at 961.

United States District Court
Northern District of California

1    However, Codexis has adequately alleged that defendants intentionally interfered with, or

2    at minimum made more difficult, Codexis's relationships with customers, business partners, and

3    collaborators.  The complaint asserts that Tao and EnzymeWorks were "aware of Codexis's

4    contracts with customers, business partners, employees and collaborators" and that the defendants'

5    "breaches of contract and other deceptive and unfair business practices" prevented the

6    performance of these contracts.  FAC ¶¶ 271-72.  Codexis provides as an example that Tao and

7    EnzymeWorks established a business relationship with one of Codexis's "long-time customers"

8    and that Codexis lost a bid to make sales to this "customer and/or its contract manufacturers,

9    which instead elected to purchase from EnzymeWorks or a competitor supplied by

10   EnzymeWorks."  *Id.* ¶ 54.  Similarly, Codexis lost the opportunity to make sales of its engineered

11   enzyme to a "major pharmaceutical corporation headquartered in Europe and/or its contract

12   manufacturers."  *Id.* ¶ 55.  Taking all inferences in Codexis's favor, the allegations plausibly state

13   a claim for interference with contractual relations.

### III.   UCL CLAIM

15   The UCL prohibits "any unlawful, unfair or fraudulent business act or practice."  Cal. Bus.

16   & Prof. Code § 17200.  "Each of these three adjectives captures a separate and distinct theory of

17   liability."  *Rubio v. Capital One Bank*, 613 F.3d 1195, 1203 (9th Cir. 2010) (quotation marks

18   omitted).  The UCL's "coverage is sweeping, embracing anything that can properly be called a

19   business practice and that at the same time is forbidden by law."  *Wilson v. Hewlett-Packard Co.*,

20   668 F.3d 1136, 1140 (9th Cir. 2012).  The FAC does not specify which prong Codexis is

21   proceeding under.  *See* FAC ¶ 285.  Because it makes passing reference to "unfair," "unlawful"

22   and "misleading" conduct I analyze its claim under all three prongs.

### A.   Unlawful Prong

24   The "unlawful" prong of the UCL "borrows violations of other laws and treats them as

25   independently actionable."  *Daugherty v. Am. Honda Motor Co., Inc.*, 51 Cal. Rptr. 3d 118, 128

26   (Ct. App. 2006).  This includes common law torts.  *Cortez v. Global Ground Support, LLC*, No.

27   09-cv-4138-SC, 2009 WL 4282076, at **2-3 (N.D. Cal. Nov. 25, 2009).

28   The Ninth Circuit has held that an intentional interference with contractual relation claim

United States District Court
Northern District of California

8

1    can serve as the predicate action underlying a UCL claim. *See CRST Van Expedited, Inc. v.*

2    *Werner Enters., Inc.*, 479 F.3d 1099, 1107 (9th Cir. 2007). Because Codexis has adequately

3    pleaded defendants' intentional interference with its contractual relations, it has likewise

4    sufficiently pleaded a UCL claim against defendants under the unlawful prong. *See Brocade*

5    *Commc'ns Sys., Inc. v. A10 Networks, Inc*., No. 10-cv-03428-LHK, 2011 WL 1044899, at *11

6    (N.D. Cal. Mar. 23, 2011) ("Because the Court has found that Brocade adequately stated a claim

7    for interference with contract, it likewise finds that Brocade has adequately alleged a UCL

8    violation based on this predicate act.").

9         **B.**      **Fraudulent Prong**

10         A defendant violates the "fraudulent" prong of the UCL by engaging in conduct by which

11    "members of the public are likely to be deceived." *Davis v. HSBC Bank Nevada, N.A*., 691 F.3d

12    1152, 1169 (9th Cir. 2012). The heightened pleading standard of Rule 9(b) applies to UCL claims

13    that are "grounded in" or "sound in" fraud. *Kearns v. Ford Motor Co*. 567 F3d 1120, 1125 (9th

14    Cir. 2009). "To satisfy Rule 9(b), a pleading must identify the 'who, what, when, where, and

15    how' of the misconduct charged, as well as what is false or misleading about the purportedly

16    fraudulent statement, and why it is false." *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc*.,

17    637 F.3d 1047, 1055 (9th Cir. 2011).

18         Codexis has sufficiently alleged a UCL claim under this prong. Codexis's theory of

19    liability is that defendants "embarked on a deliberate plan to copy Codexis's enzymes, to

20    misappropriate Codexis's trade secrets, and to misleadingly hold out to customers their copied

21    products and technical guidance as their own, all as a short-cut to entering the promising new

22    market that Codexis had created." FAC ¶ 21. The complaint provides as examples

23    EnzymeWorks's kits for ketoreductases and transaminases, which EnzymeWorks markets and

24    sells as its own but contain enzymes which are "100% molecular copies of Codexis's proprietary

25    enzymes." *Id*. ¶¶ 32-37. The kits also include "almost verbatim" copies of Codexis's written

26    guidance on the purpose and use of the kits, the laboratory steps that may be taken, equipment that

27    may be used, recommended storage conditions, and methods for analyzing data obtained through

28    the kits. *Id*. ¶ 38. These allegations are "specific enough to give defendants notice of the

1    particular misconduct which is alleged to constitute the fraud charged so that they can defend

2    against the charge and not just deny that they have done anything wrong." *Semegen v. Weidner*,

3    780 F.2d 727, 731 (9th Cir. 1985) (describing the Rule 9(b) standard).

4        **C.    Unfair Prong**

5        In cases involving unfairness to competitors, the California Supreme Court has defined

6    "unfair" as "conduct that threatens an incipient violation of an antitrust law, or violates the policy

7    or spirit of one of those laws because its effects are comparable to or the same as a violation of the

8    law, or otherwise significantly threatens or harms competition." *Cel-Tech Commc'ns, Inc.*, 20

9    Cal. 4th at 187.

10       Codexis contends it has plausibly alleged injury to competition because Tao's and

11   EnzymeWorks's selling of knock-off products confused and deceived consumers.  Oppo. at 12.

12   But the UCL has narrowly defined "unfair" to refer to "anti-competitive conduct, rather than anti-

13   consumer conduct." *Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d 718, 736 (9th Cir. 2007).

14   In the absence of any allegations of antitrust violations, such as "horizontal price fixing, exclusive

15   dealing, or monopolization," Codexis's claims that defendants' conduct confused consumers is

16   insufficient to state a claim under this prong.  *See Celebrity Chefs Tour, LLC v. Macy's, Inc.*, 16 F.

17   Supp. 3d 1123, 1140 (S.D. Cal. 2014) (finding a common law unfair competition claim based on

18   deceptive conduct had been plausibly pleaded, but not a statutory unfair competition claim

19   because of the UCL's narrow definition of "unfair").

20   **III.    INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC**

21   **RELATIONS**

22       The elements of an interference with prospective economic relations claim are: "(1) an

23   economic relationship between the plaintiff and some third party, with the probability of future

24   economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional

25   acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the

26   relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the

27   defendant." *CRST Van Expedited, Inc.*, 479 F.3d at 1108.  The primary difference between

28   intentional interference with prospective economic advantage and intentional interference with

10

1    contractual relations is that interference with prospective economic relations requires a plaintiff to

2    allege an act that is wrongful independent of the interference itself. *Id.* "[A]n act is independently

3    wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory,

4    common law, or other determinable legal standard." *Korea Supply Co. v. Lockheed Martin Corp.*,

5    29 Cal. 4th 1134, 1159 (2003).

6            Defendants attack Codexis's claim for interference with prospective economic advantage

7    on the basis that Codexis fails to properly allege an interference with contractual relations claim

8    and therefore cannot base its interference with prospective economic relations claim on this

9    conduct. However, as described previously, Codexis has sufficiently pleaded an interference with

10   contractual relations claim. Furthermore, the Ninth Circuit has held a violation of the UCL can

11   serve as the independent, wrongful act necessary to support an intentional interference with

12   economic advantage claim. *See CRST Van Expedited, Inc*., 479 F.3d at 1109. While this may

13   appear to create an end run around the "independent act" requirement, the Ninth Circuit squarely

14   considered this functional merger of the two torts and found it to be consistent with the

15   requirements of California law. *See id.* at 1110 ("We are aware that our reasoning works a

16   practical merger of the two common law torts of intentional interference with existing contract and

17   intentional interference with prospective economic relationships, where the two are alleged to

18   coexist along with a contemporaneous and derivative UCL violation" but find it to be consistent

19   with California Supreme Court decisions.).

20          Because Codexis has successfully pleaded both a UCL claim and an interference with

21   contractual relations claim, defendants' motion to dismiss the interference with prospective

22   economic relations claim is DENIED.

23   **IV.    COMMON LAW UNFAIR COMPETITION**

24          Under California law, "[t]he common law tort of unfair competition is generally thought to

25   be synonymous with the act of 'passing off' one's goods as those of another or acts analogous to

26   'passing off,' such as the sale of confusingly similar products, by which a person exploits a

27   competitor's reputation in the market." *Southland Sod Farms v. Stover Seed Co*., 108 F.3d 1134,

28   1147 (9th Cir. 1997) (internal modifications omitted). "'Passing off' (or palming off, as it is

United States District Court
Northern District of California

1    sometimes called) occurs when a producer misrepresents his own goods or services as someone

2    else's." *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 28 n.1 (2003).

3    "'Reverse passing off,' as its name implies, is the opposite: The producer misrepresents someone

4    else's goods or services as his own." *Id.* "The tort developed as an equitable remedy against the

5    wrongful exploitation of trade names and common law trademarks that were not otherwise entitled

6    to legal protection." *Bank of the W. v. Superior Court*, 2 Cal. 4th 1254, 1263 (1992).

7         Codexis's common law unfair competition claim is based on allegations of: (1) "copying

8    of Codexis's products," "technical literature," "presentations of Codexis's technical information;"

9    and "Codexis's business model;" (2) "deceiv[ing] and confus[ing] the consuming public by

10   holding out their copied biocatalysis products and literature and the related innovations and

11   expertise as their own, when in fact Codexis is the true source of such products, literature,

12   innovation, and expertise;" and (3) "improper, dishonest, and unfair extracting of information,

13   reverse engineering, deconstructing, disassembling, sequencing, copying, altering, modifying,

14   and/or creating a variant or derivative of the Codexis products in violation of the Codexis Terms

15   & Conditions." FAC ¶ 289. Defendants argue that Codexis has failed to state a plausible claim

16   because the allegations are preempted by patent, copyright, and trade secret law, or are otherwise

17   not actionable.

18        If a plaintiff bases a tort claim on conduct that is protected or governed by federal patent or

19   copyright law, it is preempted by that area of law. *See Hunter Douglas, Inc. v. Harmonic Design,*

20   *Inc.*, 153 F.3d 1318, 1335 (Fed. Cir. 1998); *Kodadek v. MTV Networks, Inc.*, 152 F.3d 1209, 1212

21   (9th Cir. 1998). However, if the state law cause of action incorporates "extra elements" that are

22   qualitatively different from patent or copyright law, the claim is not necessarily preempted. *See*

23   *Grosso v. Miramax Film Corp.*, 383 F.3d 965, 968 (9th Cir. 2004) ("To survive preemption, the

24   state cause of action must protect rights that are qualitatively different from the rights protected by

25   copyright: the complaint must allege an 'extra element' that changes the nature of the action.");

26   *Summit Mach. Tool Mfg. Corp. v. Victor CNC Sys., Inc.*, 7 F.3d 1434, 1439-40 (9th Cir. 1993)

27   ("Preemption analysis involves determining whether the state law claim contains an element not

28   shared by the federal law; an element which changes the nature of the action so that it is

United States District Court
Northern District of California

12

1  qualitatively different from a copyright or patent infringement claim.") (internal quotation marks

2  and modifications omitted).

3         CUTSA preemption functions similarly.  CUTSA preempts state law claims when they are

4  "based on the same nucleus of facts as the misappropriation of trade secrets claim for relief."  *K.C.*

5  *Multimedia, Inc.*, 171 Cal.App.4th at 958.  However, CUTSA "does not displace noncontract

6  claims that, although related to a trade secret misappropriation, are independent and based on facts

7  distinct from the facts that support the misappropriation claim."  *Angelica Textile Servs., Inc. v.*

8  *Park*, 220 Cal. App. 4th 495, 506 (2013).

9         Codexis has sufficiently pleaded the existence of the "extra elements" needed to

10  differentiate its common law unfair competition claim from a patent, copyright, or trade secret

11  claim.  The complaint contains a host of allegedly improper acts such as recruiting Codexis's

12  scientists because of their knowledge of confidential information, copying Codexis's protocols

13  and technical guidance, imitating its business model, and photographing a Codexis presentation

14  during a conference in violation of the conference's rules.  FAC ¶¶ 26, 27, 38, 39.  Codexis also

15  alleges that defendants violated the terms and conditions of Codexis's products by "improper,

16  dishonest, and unfair extracting of information, reverse engineering, deconstructing,

17  disassembling, sequencing, copying, altering, modifying, and/or creating a variant or derivative

18  of" Codexis's products.  *Id*. ¶ 289.  This conduct enabled the defendants to "deceive and confuse

19  the consuming public by holding out their copied or improperly derived products, literature,

20  innovation, and expertise as their own."  *Id*. ¶ 289.  Considering the range of conduct pleaded, the

21  allegations are sufficient to state a claim of common law unfair competition.  *See Bank of the W. v.*

22  *Superior Court*, 2 Cal. 4th at 1263 (noting that the tort of unfair competition may include acts

23  "analogous to 'passing off,' such as the sale of confusingly similar products, by which a person

24  exploits a competitor's reputation in the market).

25  **VI.     AGENCY AND ALTER EGO LIABILITY**

26         **A.     Alter Ego**

27         Codexis asserts that Tao and both EnzymeWorks entities are alter egos of each other.  "The

28  alter ego doctrine arises when a plaintiff comes into court claiming that an opposing party is using

United States District Court
Northern District of California

13

the corporate form unjustly and in derogation of the plaintiff's interests." *Mesler v. Bragg Mgmt. Co.*, 39 Cal. 3d 290, 300 (1985).  The doctrine has two elements: (1) "there must be such a unity of interest and ownership between the corporation and its equitable owner that the separate personalities of the corporation and the shareholder do not in reality exist;" and (2) "there must be an inequitable result if the acts in question are treated as those of the corporation alone." *Sonora Diamond Corp. v.Super. Ct. of Tuolumne Cnty*., 83 Cal. App. 4th 523, 538 (2000).

### i.      Unity of Interest

Factors that indicate a unity of interest include "[1] commingling of funds, [2] failure to maintain minutes or adequate corporate records, [3] identification of the equitable owners with the domination and control of the two entities, [4] the use of the same office or business locations, [5] the identical equitable ownership of the two entities, [6] the use of a corporation as a mere shell, instrumentality or conduit for a single venture or the business of an individual, and [7] the failure to adequately capitalize a corporation." *Sonora*, 83 Cal. App. 4th at 538-39.  Ownership is a prerequisite to alter ego liability, and not a mere "factor" or "guideline."  *S.E.C. v. Hickey*, 322 F.3d 1123, 1128 (9th Cir. 2003).

Based on the allegations that: (1) "Tao is an officer and director of both EnzymeWorks entities, the two entities share key employees and offices, and Tao uses EnzymeWorks as a subterfuge for his illegal use of Codexis's confidential and proprietary technology;" (2)  "forming the two EnzymeWorks entities in an attempt to shield Tao and either entity from liability was part of Tao's plan;" (3) "Tao and each EnzymeWorks entity share the same offices;" (4) "the EnzymeWorks entities share the same employees, including at least Tao;" and (5) "when Tao or either EnzymeWorks entity receives an order for a product, that order may be fulfilled  and the product shipped by any of them," Codexis has plausibly pleaded a unity of interest between Tao and EnzymeWorks.  FAC ¶¶ 19, 57, 65.

### ii.      Inequitable Result

California courts generally require some evidence of bad faith before concluding that an inequitable result justifies an alter ego finding.  *Smith v. Simmons*, 638 F. Supp. 2d 1180, 1192 (E.D. Cal. 2009), *aff'd*, 409 F. App'x 88 (9th Cir. 2010).  The complaint contains multiple

United States District Court
Northern District of California

1  allegations of misconduct surrounding the founding of EnzymeWorks.  For example, the

2  complaint asserts that Tao left his former employer with Codexis's "proprietary information" and

3  he "recruited and invited other Codexis employees and former employees to come to

4  EnzymeWorks in an effort to learn more about Codexis's confidential, proprietary and trade secret

5  information."  FAC ¶¶ 16, 22.  Codexis further alleges that Tao built EnzymeWorks upon this

6  "infected foundation" of trade secret theft, breach of contract, willful infringement of patent law,

7  and other improper conduct.  *Id.* ¶¶ 3, 57.  Accordingly, injustice would result if Tao were allowed

8  to avoid liability by hiding behind EnzymeWorks's corporate structure or if Tao were unable to

9  pay a potential monetary judgment associated with this action.

10  **B.     Agency**

11  Defendants contend that because the FAC "does not even allege who is the principal or

12  who is the agent, and is completely devoid of facts to establish the plausibility of a principal/agent

13  relationship" no agency liability has been established.  Mot. at 22.  I agree.

14  Common law agency doctrine is based on an analysis of three factors: "(1) manifestation

15  by a principal that the agent would act on its behalf; (2) the agent's acceptance or consent to act on

16  the principal's behalf; and (3) the understanding that the principal would be in control of the

17  agent's undertaking on its behalf."  *Sun Microsystems Inc. v. Hynix Semiconductor Inc.*, 622 F.

18  Supp. 2d 890, 898 (N.D. Cal. 2009).  Codexis's single allegation regarding agency provides:

19
20
21
22  On information and belief, Tao and both EnzymeWorks entities are the agent, representative, and/or principal of each other, such that Tao and both EnzymeWorks entities are acting on behalf of, under the authority of, with full knowledge and consent of, and /or as the agent of each other, and Tao and both EnzymeWorks entities are engaged in activities that, but for the others, they would have to undertake themselves.

23  FAC ¶ 66.  Because this fails to provide factual allegations pertaining to any of the three common

24  law factors, Codexis has not established an agency relationship between any of the defendants.

25  **CONCLUSION**

26  Defendants' motion to dismiss the agency theory of liability and the unfairness prong of

27  the UCL claim is GRANTED with leave to amend within twenty days of this Order.  The

28

15

remainder of the motion to dismiss is DENIED.

**IT IS SO ORDERED**.

Dated: August 11, 2016



WILLIAM H. ORRICK
United States District Judge